IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

HIMARK BIOGAS, INC.,

    Plaintiff

    vs.                                      Case No. 14-1070-SAC

WESTERN PLAINS ENERGY LLC,

    Defendant.


MEMORANDUM AND ORDER

          The defendant Western Plains Energy LLC ("WPE") moves the
court to compel arbitration and stay the action. (Dk. 7). This action arises
from the design, installation, and construction of a biogas plant ("Plant") at
WPE's ethanol production facility in Gove County, Kansas. From its ethanol
production waste and other feedstock, including cattle feedlot manure, the
Plant was intended to produce enough biogas using an anaerobic digester
that it would meet WPE's energy needs. The plaintiff Himark biogas, Inc.
("Himark) conducted the feasibility study for the digester, provided
consulting services, and licensed the technology for the digester. WPE
contracted with the non-party ICM, Inc. to serve as general contractor and
provide various services for the design and construction of the digester using
Himark's licensed technology. Besides incurring expenses far in excess of
projected costs, WPE's digester has not performed as expected.  Both ICM
and Himark blame others, including WPE, for the digester's substandard

performance. *See* Complaint, Dk. 1, ¶ 20. Both also believe that WPE owes each of them more monies for their work. *See* WPE's Statement of Claim in Arbitration Proceeding Dk. 7-8, p. 3. WPE began an arbitration proceeding against ICM in Kansas, and WPE now seeks to compel Himark's current action into arbitration too.

Himark filed this action against only WPE seeking to recover on several different theories. Himark first sues for breach of contract and unjust enrichment/quantum meruit wanting to recover for the consulting services it provided after November 2012, for an injunction to require WPE to conduct the necessary testing that would trigger the additional $1,000,000 license fee under the license agreement, for a preliminary injunction to enjoin WPE from operating the digester and making unauthorized disclosures of confidential information, and for patent infringement.

**Factual Background--Agreements and Arbitration Provisions**

After the feasibility study, WPE and Himark entered into a "Consulting Agreement" and a "Licensing Agreement" on November 11, 2011. The Consulting Agreement explained that WPE was contracting to use Himark's consulting services, as well as its technologies pursuant to a separate license agreement, for the stated "Purpose" of taking feedstock and producing biogas at a benchmark production level that would meet WPE's heating and electricity needs. (Dk. 7-1, pp. 2, 3-4). Under the Consulting Agreement, Himark agreed to:

> provide consulting services to WPE in order to facilitate the construction and operation of the <u>Oakley IMUS</u> Facility in accordance with the Purpose ("**Consulting Services"**). The foregoing Consulting Services shall include, but not be limited to, Highmark working with WPE and its chosen contractor, during both the design and construction phases of the Plant, in order to provide on-site supervision, training, and engineering services as necessary to support the construction and operation of the Plant.

(Dk. 7-1, p. 5, ¶ 2.1). The Consulting Agreement provided it was effective for one year, (Dk. 7-1, p. 13, ¶ 11.1), and it included a survival clause that "[t]he terms and conditions which by their nature should survive the termination of this Agreement shall so survive," *id.* at ¶ 11.7. The consulting agreement also included this arbitration provision:

> In the event of any dispute among the parties arising from or related to this Agreement (a "**Dispute**"), each Party agrees to cooperate with the other Party and mutually work together in good faith towards the resolution of the Dispute . . . .
> In the event that the Parties fail to resolve the <u>Dispute</u> within the <u>Resolution Period</u>, the Parties agree that the <u>Dispute</u> shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce . . . .
> The arbitration will be conducted in the city of Edmonton, Alberta Canada in the English language.

*Id.* at p. 17, ¶ 13.7.

Also on November 11, 2011, WPE and Himark entered into the Licensing Agreement. In an opening clause, Himark agreed "to provide consulting services in relation to . . . [its technologies] pursuant to a separate consulting agreement, and grant  . . . [WPE] a limited license" to its technologies. (Dk. 7-2, p. 2).  The Licensing Agreement stated the same "Purpose" for the contractual relations between the parties as was stated in

3

the Consulting Agreement. (Dk. 7-1, pp. 4-5; Dk. 7-2, p. 5). The Licensing

Agreement granted WPE a limited license to use Himark's technology for the

stated "Purpose" and any use of the technology beyond that "Purpose" or at

a different plant would be the subject of separate agreements or

addendums. (Dk. 7-2, pp. 4-5). The Licensing Agreement provided that WPE

would pay a $1,000,000 license fee "upon successful completion of the

Performance Test." *Id.* at p. 8. The parties also agreed that the licensed

technology would meet specifications, that the "Performance Test" would be

sole measure of conformity with warranty requirements, and that if the

specifications were not met after the Test, then Himark shall "make such

changes in design, construction, or equipment as required to meet the"

specifications and Performance Test. *Id.* at p. 16. The Licensing Agreement

specified that it remained effective for the lifetime of WPE's Plant unless it is

terminated. *Id.* at p. 18. Finally, the arbitration provision in the Licensing

Agreement is identical to that in the Consulting Agreement. (Dk. 7-1, p. 17;

Dk. 7-2, pp. 20-21).

Later that same month, WPE and ICM entered into a work

agreement for ICM to "perform all work necessary to provide engineering,

procurement, construction and commissioning services to provide Western

Plains Energy an Anaerobic Digestion Facility utilizing" Himark technology.

(Dk. 7-3, p. 22). The Working Agreement included this arbitration provision:

> 16.1  Any dispute arising between the Parties concerning this
> Agreement or the rights and duties of either Party in relation thereto

> shall first be submitted to a panel consisting of at least one
> representative of each Party who shall have the authority to enter into
> a written agreement to resolve the dispute. . . .
> 16.2 In the event the process described in Article 16.1 does not
> resolve the dispute within a reasonable period of time the dispute shall
> be resolved by arbitration . . . .

(Dk. 7-3, p. 11). This agreement was modified in the first part of 2012 by a change order indicating that WPE had "requested" ICM to contract with Himark to provide engineering services and support during construction and startup and that this change was incorporated into ICM's scope under the Work Agreement. (Dk. 7-5, p. 1) The contract referenced in this change order appears to be the Engineering Services Agreement next discussed.

On December 1, 2011, ICM and Himark entered into an Engineering Services Agreement that defined the project as follows:

> Highmark will perform the detailed design and engineering work and
> provide the project support, start-up services and training as detailed
> below for the WPE bioGas Plant . . . . ICM acknowledges and agrees
> that a sanctioned WPE bioGas Plant based on the engineering designs
> and documents provided by Highmark hereunder will require a
> licensing arrangement between WPE and Highmark for the use of . . .
> technology (the **"<u>License Agreement</u>"**).

 (Dk. 7-4, p. 2). This agreement also included an arbitration provision that is the same as those in the Consulting Agreement and Licensing Agreement except specifying the arbitration would occur in Minneapolis, Minnesota. (Dk. 7-4, p. 11).

As alleged in its complaint, less than a year after entering the Engineering Services Agreement with ICM, Himark resumed working directly with WPE in providing consulting services:

21. Rather than work through ICM, in late November 2012 WPE elected to engage Himark directly to provide extensive consulting services to WPE to help it achieve Nameplate production in spite of the issues inherited from ICM. By doing so, WPE was able to work with Himark engineers to successfully resolve many of the Plant's issues. By doing so, WPE was also able to avoid a 10% surcharge ICM was adding to Himark's engineering services performed pursuant to the December 1, 2011 agreement between ICM and Himark, which ICM was passing on to WPE. WPE sought to avoid the surcharge and to have more control and direct contact with Himark as the expert regarding its own proprietary Himark Technologies.

22. Under the agreement between WPE and Himark, WPE agreed to keep Himark engineers and sub-contractors on site at WPE to extensively evaluate the Plant and recommend the steps necessary to resolve the inability of the plant to achieve Nameplate production. WPE agreed that it would be billed directly for the consulting services provided by Himark starting December, 2012.

(Dk. 1, p. 8). Himark further alleges that its "engineers provided thousands of hours of services from December 2012 through December 2013." (Dk. 1, p. 9, ¶ 23). Himark claims that WPE has not paid the invoices submitted for this consulting engineering work performed after November 2012 and owes Himark in excess of $1.5 million. *Id.* at ¶ 24. This claim of unpaid services is the basis for counts one and two of Himark's complaint.

Count three of the Himark's complaint seeks an injunction against WPE for the Performance Test required by the License Agreement to be conducted so as to trigger the $1 million License Fee under the License Agreement. Count four seeks to enjoin WPE from operating the Digester and from making unauthorized disclosures of Himark's confidential information. Count five claims WPE's continued use of Himark's technology without a current license agreement is infringing Himark's patents.

**Legal Standard and Analysis**

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, establishes the enforceability of arbitration clauses in commerce contracts. Agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Act is a "congressional declaration of a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Thus, "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." *Id*. While the FAA "preempt[s] state laws that aim to channel disputes into litigation rather than arbitration, even under the FAA it remains a 'fundamental principle' that 'arbitration is a matter of contract,' not something to be foisted on the parties at all costs." *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 977 (10th Cir. 2014) (quoting *AT & T Mobility LLC v. Concepcion*, --- U.S. ---, 131 S. Ct. 1740, 1745 (2011)). By operation, § 3 of the FAA "obliges courts to stay litigation on matters that the parties have agreed to arbitrate;" and § 4 "authorizes a federal district court to compel arbitration when it would have jurisdiction over a suit on the underlying dispute." *Hill v. Ricoh Americas Corp.* 603 F.3d 766, 771 (10th Cir. 2010) (citation omitted).

"Absent some ambiguity in the agreement, however, it is the language of the contract that defines the scope of disputes subject to

arbitration." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002) (citation omitted). The parties' expressly agreed to arbitrate "any dispute among the parties arising from or related to" the Licensing Agreement. (Dk. 7-2, p. 20, ¶. 13.7). Count three that seeks to enjoin WPE's compliance with a term of the Licensing Agreement plainly comes within the terms of this arbitration provision. Nor is it much of stretch to conclude that count four also arises from the Licensing Agreement, as Himark's complaint alleges for this count the following:

> Himark acknowledges that the License Agreement contains an arbitration provision, but Himark requests that, in the alternative to the affirmative injunction requested in Count III, the Court enter a preliminary injunction against WPE and thereby enjoin WPE from operating the Plant in order to preserve the *status quo ante* and to prevent further unauthorized disclosures of Himark's confidential information such as the unauthorized disclosure to Burns & McDonnell that occurred in spite of Himark's warnings that such disclosure would be a violation of the License Agreement.

(Dk. 1, ¶ 58). Seeking alternative relief to count three pursuant to the terms of the Licensing Agreement and the ICC's Rules of Arbitration, (Dk. 10, pp. 12-13), Himark's count four arises from the Licensing Agreement. To the extent that count four may allow for interim relief in advance of arbitration, the plaintiff has yet to file a separate motion seeking the same. Because this case is now to be submitted for arbitration, the availability of such interim relief will be subject to the arbitration rules. As for count five, it too arises from or is related to the Licensing Agreement in that Himark is alleging patent infringement because WPE has refused to pay the licensing fee under

terms required by the Licensing Agreement, failed to comply and maintain a valid license under the Licensing Agreement, and has not stopped using the digester after failing to pay the license fee. (Dk. 10, pp. 13-14).

The court's conclusion that these claims come within the scope of the arbitration clause is consistent with the Tenth Circuit's holding that the phrase, "arising out of or relating to," such as is found in the Licensing Agreement, is a broad arbitration clause.  *See Brown v. Coleman Co., Inc.*, 220 F.3d 1180, 1184 (10th Cir. 2000), *cert. denied*, 531 U.S. 1192 (2001); *P & P Industries, Inc. v. Sutter Corp.*, 179 F.3d 861, 871 (10th Cir. 1999) (citing *Prima Paint Corp. v Flood & Conklin Mfg. Co.*, 388 U.S. 395, 398 (1967)); *see e.g.*, *Schmidt v. Wine*, 2013 WL 3991808 at *3 (D. Kan. 2013); *Locke-O'Dell v. Global Client Solutions, LLC*, 2012 WL 1033624, at *3 (D. Kan. 2012). "When a contract contains a broad arbitration clause, matters that touch the underlying contract should be arbitrated." *Brown*, 220 F.3d at 1184 (citing in part, *Mitsubishi Motors v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 624 n.14 (1985)). It also means "that the strong presumption in favor of arbitrability . . . applies with even greater force." *P & P Industries, Inc.*, 179 F.3d at 871 (internal quotation marks and citations omitted).

Counts one and two are claims to recover for Himark's consulting services performed after November 2012. Himark alleges that the parties entered into a separate contract to provide these consulting services as evidenced by oral communications and emails. Himark argues this same

9

evidence does not refer to any agreement to arbitrate as a term of the separate contract. WPE denies that a separate contract was made, that the emails evidence any agreement, or that it paid Himark consistent with any such agreement. WPE argues several alternative grounds for finding arbitration required here. Because Himark was a subcontractor of ICM and the ICM/WPE Work Agreement included an arbitration clause, WPE argues that Himark should be equitably estopped from seeking compensation and avoiding the arbitration clause. Counts one and two are related to the Licensing Agreement and subject to its arbitration provision. Since Himark's consulting services performed after November 2012 were a continuation of services required by the Consulting Agreement before it expired in November 2012, the arbitration provision in that Agreement should survive. As for the proper venue of an arbitration proceeding, WPE describes this as a procedural issue reserved for the arbitrator to decide.

The court concludes that counts one and two to recover for consulting services performed after November 2012 come within the scope of "any dispute among the parties . . . related to" the Licensing Agreement. "[A]ll claims with a significant relationship to the [Agreement,] regardless of the label attached to them arise out of and are related to the Agreement." *P & P Industries, Inc.*, 179 F.3d at 871 (internal quotation marks and citations omitted). This determination of scope "turns on the factual allegations in the complaint rather than the legal causes of action asserted." *Id.* In the

Licensing Agreement, Himark expressly agreed "to provide consulting services in relation . . . [to its technology] pursuant to a separate conculting agreement." (Dk. 7-2, p. 2). Himark did not limit its agreement to provide consulting services to a particular consulting agreement. Thus, any agreement by Himark to provide consulting services in support and in relation to its licensed technology and any dispute resulting therefrom are necessarily "related to" the Licensing Agreement. The Licensing Agreement shows the significant relationship between it and the consulting services as Himark expressly agreed under the former to provide these services "in relation to these technologies." (Dk. 7-2, p. 2). Additionally, Himark's complaint alleges its consulting services after November 2012 were provided to help WPE "achieve Nameplate production" that is the production which the Plant was designed to yield. (Dk. 1, ¶¶ 19 and 21). Thus, by its own allegations, Himark provided these consulting services in order to help meet the performance standards in the Licensing Agreement which would trigger payment of the license fee. (Dk. 7-2, p. 8). The Licensing Agreement further obligates Himark to "make such changes in design, construction, or equipment as required to meet" specifications after the failed performance test. (Dk. 7-2, p. 16). The court finds that the dispute over payment of consulting services in counts one and two is significantly related to the licensing agreement.

The court does not find that Himark has raised a genuine issue for trial on whether to compel arbitration. There may be an issue of fact over whether the parties entered into a separate agreement for consulting services after November of 2012.[1] This issue is not material for even if there was a separate, later agreement, the court would still regard the arbitration provision in the Licensing Agreement as covering this dispute. Applying the four-factor test in *Consolidated Brokers Ins. Services, Inc. v. Pan-American Assurance Co., Inc.*, 427 F. Supp. 2d 1074 (D. Kan. 2006), the court would find that the Licensing Agreement expressly references the agreements for Himark to provide consulting services; expressly recognizes the need for Himark's consulting services in using Himark's technology and the intent of both parties to have these services be a significant part of their licensing arrangement; does not exclude any claims from arbitration and broadly extends to any disputes related to the Licensing Agreement; and involves the same parties who were engaged in the ongoing work of designing, installing, constructing, modifying, and bringing the Plant into operation at performance standards. The court concludes that the arbitration clause of the Licensing Agreement covers any dispute between the parties related to this agreement including the performance and payment of Himark's consulting services after November 2012.

---

[1] The email dated March 12, 2013, (Dk. 11-1) certainly contradicts any claim that WPE and Himark had reached some agreement as of the February 2013 emails exchanged between the same officers.

Concluding that the arbitration clause in the Licensing Agreement applies to all of Himark's claims for the reasons stated above, the court shall grant the defendant's motion.

IT IS THEREFORE ORDERED that the defendant's motion to compel arbitration and to stay action (Dk. 7) is granted, and all of the plaintiff's pleaded claims against the defendant are subject to arbitration, and this case is stayed pending arbitration;

IT IS FURTHER ORDERED that the parties shall proceed to arbitration in accordance with the Licensing Agreement's arbitration clause;

IT IS FURTHER ORDERED that this court shall retain jurisdiction to review, modify, or vacate any arbitration awards, should any party choose to seek such action as permitted by the Federal Arbitration Act;

IT IS FURTHER ORDERED that the parties shall file a joint status report, not less than every six (6) months (commencing six months after the filing date of this order), regarding the progress of the arbitration.

Dated this 16th day of July, 2014, Topeka, Kansas.


s/Sam A. Crow
Sam A. Crow, U.S. District Senior Judge

13